[Cite as *State ex rel. Cafaro Mgt. Co. v. Indus. Comm.*, 2013-Ohio-5104.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Cafaro Management Company, | : | |
| | : | |
| Relator, | : | |
| | : | No. 12AP-638 |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio and Deborah Lovas, | : | |
| | : | |
| Respondents. | : | |

## D E C I S I O N

### Rendered on November 19, 2013

*Michael J. Wright,* for relator.

*Michael DeWine*, Attorney General, and *Cheryl J. Nester,* for respondent Industrial Commission of Ohio.

*Scott A. Rosenthal,* for respondent Deborah Lovas.

### IN MANDAMUS
### ON OBJECTIONS TO THE MAGISTRATE'S DECISION

CONNOR, J.

{¶ 1} Relator, Cafaro Management Company, brings this original action seeking a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order apportioning 25 percent of claimant's permanent total disability ("PTD") award to claim No. 08-0852146, and to enter an amended order allocating the entire award to claim No. 90-1125.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who rendered a decision and

recommendation that includes findings of fact and conclusions of law, which is appended hereto.  The magistrate concluded that the commission abused its discretion by allocating 25 percent of claimant's award to claim No. 08-0852146, "without an explanation that this court can review in mandamus."   (Magistrate's Decision, 17.)   Accordingly, the magistrate recommended that we issue a writ of mandamus "ordering the commission to vacate that portion of its SHO's order of April 11, 2012 that allocates the award, and to enter a new order in a manner consistent with this magistrate's decision that properly allocates the award between the two industrial claims."  (Magistrate's Decision, 17.)

{¶ 3}  Both parties have filed objections to the magistrate's decision and the matter is now before us for our independent review.

{¶ 4}  In its objection, relator argues that the magistrate erred in concluding that the report issued by M.P. Patel, M.D. provided "some evidence" upon which the commission could rely in support of its decision to allocate 25 percent of claimant's PTD award to claim No. 08-0852146.

{¶ 5}  Our "review of the commission's orders in mandamus is governed by the 'some evidence' standard."  *State ex rel. Simms v. Ford Motor Co.*, 10th Dist. No. 09AP-165, 2010-Ohio-671, ¶ 4, citing *State ex rel. Rouch v. Eagle Tool & Machine Co.*, 26 Ohio St.3d 197 (1986).  If a medical report is either equivocal or internally inconsistent it is not "some evidence."  *State ex rel. George v. Indus. Comm.*, 130 Ohio St.3d 405, 407, 2011-Ohio-6036, ¶ 11, citing *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649 (1994).  Equivocation "occurs 'when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement.' "  *George* at ¶ 15, quoting *Eberhardt* at 657.

{¶ 6}  Relator argues that Dr. Patel's medical report is equivocal inasmuch as he considered both healed conditions and disallowed conditions in formulating his opinion on PTD.  We disagree.

{¶ 7}  There is no question that Dr. Patel discussed a number of medical conditions in his report that were either completely healed or non-allowed.  However, as the magistrate noted, such discussion took place in the context of Dr. Patel's review of claimant's medical history and in relating his findings following physical examination of claimant.  It is also true that some of the healed and non-allowed conditions are similar in

nature to the allowed conditions in the 2008 claim. Nevertheless, in rendering his "**Opinion**" regarding claimant's PTD application, Dr. Patel referenced only those conditions specifically allowed in the two claims. (Magistrate's Decision, 5.).

{¶ 8} Relator argues that Dr. Patel employed a "shotgun approach" in determining claimant's disability, and that he "lumped together" the allowed conditions without differentiating minor and resolved conditions from the more significant conditions. However, the magistrate carefully addressed relator's arguments, and we agree with the magistrate's analysis.

{¶ 9} To the extent that relator argues that Dr. Patel's report is critically flawed because it does not comport with the requirements of Ohio Adm.Code 4121-3-34, the magistrate specifically found that such guidelines expressly apply only to independent medical examiners. The language used in the Ohio Administrative Code supports the magistrate's finding and, for the reasons set forth by the magistrate, we reject relator's argument. Furthermore, to the extent that relator argues that Dr. Patel's report must be drafted in accordance with American Medical Association guidelines, relator has presented no legal support for such an argument.

{¶ 10} In short, upon review of Dr. Patel's report and in consideration of relator's arguments, we do not agree that the report is equivocal or inconsistent. Thus, the magistrate did not err in concluding that Dr. Patel's report provided some evidence in support of the commission's ruling. Accordingly, relator's objection is overruled.

{¶ 11} Respondent objects to the magistrate's conclusion "that the commission abused its discretion by allocating 25 percent of the award to the 2008 claim without an explanation that this court can review in mandamus." (Magistrate's Decision, 17.) The commission argues that it need not "specifically justify the exact figure allocated to each claim." (Respondent's Objection, 2.) We agree.

{¶ 12} The commission is the exclusive evaluator of disability. *See State ex rel. Kelly Servs., Inc. v. Indus. Comm,* 10th Dist. No. 05AP-1192, 2006-Ohio-5868, ¶ 3, citing *State ex rel. Kirkendall v. Indus. Comm.*, 87 Ohio St.3d 182, 183 (1999). Indeed, this court has held that the commission need not extrapolate from the expert's allocation of whole person impairment in order to determine the percentage of a PTD award to allocate to each employer. *Kelly Servs.*

{¶ 13} The magistrate acknowledged that "it was not necessarily improper for the commission to point out in its order that it was the injury in the 2008 claim that removed claimant from the workforce * * * [and that] * * * some percentage allocation to the 2008 claim would be proper." (Magistrate's Decision, 17.) However, the magistrate, relying on *State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm.*, 71 Ohio St.3d 139 (1994), concluded that the commission had a duty to provide a more detailed explanation for the 25 percent allocation. We disagree.

{¶ 14} In *Yellow Freight*, the commission elected to allocate claimant's entire PTD award to one claim even though the medical evidence expressly relied upon by the commission contradicted such an allocation. *Id.* at 143. Under such circumstances, the court returned the cause to the commission for "further consideration and an amended order." *Id.*

{¶ 15} Here, the commission explained that claimant returned to work following the 1990 injuries but that the industrial injury in 2008 permanently removed claimant from the workforce. Thus, unlike the *Yellow Freight* case, the allocation of the PTD award among the two claims in this case is completely consistent with the evidence expressly relied upon by the commission. Under these circumstances, the commission was under no obligation to provide further explanation. *See Kelly Servs.* at ¶ 6 (although claimant was able to return to the workforce after the first industrial injury, it was not an abuse of discretion for the commission to apportion one-half of claimant's PTD award to a subsequent claim, where the second injury permanently removed claimant from the workforce). Accordingly, respondent's objection is sustained.

{¶ 16} Following independent review, pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and we adopt them as our own. However, we disagree with the magistrate's conclusion of law as noted herein. Accordingly, for the reasons set forth in this decision, we hereby overrule relator's objection, sustain respondent's objection, and deny the requested writ of mandamus.

*Writ of mandamus denied.*

TYACK and DORRIAN, JJ., concur.

_____

# A P P E N D I X

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Cafaro Management Company, | : | |
| | : | |
| Relator, | | |
| | : | No. 12AP-638 |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio and Deborah Lovas, | : | |
| | : | |
| Respondents. | : | |

---

### M A G I S T R A T E ' S   D E C I S I O N

### Rendered on June 17, 2013

---

*Michael J. Wright,* for relator.

*Michael DeWine,* Attorney General, and *Cheryl J. Nester,* for respondent Industrial Commission of Ohio.

*Scott A. Rosenthal,* for respondent Deborah Lovas.

---

### IN MANDAMUS

{¶ 17} In this original action, relator, Cafaro Management Company, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate that portion of its order that allocates 25 percent of an award of permanent total

disability ("PTD") compensation to relator in claim No. 08-852146, and to enter an amended order that allocates the entire award to another employer in claim No. 90-1125.

Findings of Fact:

{¶ 18} 1.  On January 27, 1990, respondent, Deborah Lovas ("claimant"), sustained an industrial injury while employed as a security detective for Joseph Horne Co., Inc., a state-fund employer.  On that date, claimant fell from a ladder.  The industrial claim (No. 90-1125) ("the 1990 claim") is allowed for:

> Cervical, dorsal and lumbar myositis; tendonitis right shoulder and arm; bulging disc L5-S1; lumbar and cervical radiculopathy; post-traumatic headache syndrome; rotator cuff strain, right; trapezial myositis; depressive disorder; dysthymic disorder.

{¶ 19} 2.  On August 25, 2008, claimant sustained an industrial injury while employed as an administrative assistant for relator.  On that date, claimant slipped on some papers strewn on the floor and she fell.  The industrial claim (No. 08-852146) ("the 2008 claim") is allowed for:

> Contusion of buttock; contusion of back; sprain of neck; sprain thoracic region; sprain lumbar region; sprain of left knee and leg; substantial aggravation of pre-existing chondromalacia patella II, left knee; contusion left elbow; contusion left hip.

{¶ 20} 3.  According to the complaint filed in this action, claimant was employed with relator from approximately June 4, 2007 until August 25, 2008.

{¶ 21} 4.  Temporary total disability ("TTD") compensation was paid to claimant in the 2008 claim commencing April 30, 2009.

{¶ 22} 5.  On September 8, 2010, the Ohio Bureau of Workers' Compensation ("bureau") moved to terminate TTD compensation in the 2008 claim.

{¶ 23} 6.  Following an October 20, 2010 hearing, a district hearing officer ("DHO") issued an order terminating TTD compensation in the 2008 claim on grounds that the allowed conditions of the claim have reached maximum medical improvement ("MMI").  TTD compensation was terminated effective the date of the hearing.

{¶ 24} 7.  On May 25, 2011, at claimant's own request, she was examined by M.P. Patel, M.D.  In his four-page narrative report, Dr. Patel states:

**History and Clinical Course**

During course of her employment with Horne's Department Store as a store detective, on January 27, 1990, Ms. Lovas fell from a ladder approximately 16 feet, landing on her feet. She tried to hang from the ladder to keep from falling and sustained injury to shoulder. Injuries to other body parts were as a result of the impact when she landed.

After initial examination at Emergency Room, Ms. Lovas began treating with Dr. Stanich. Diagnostic studies included X-rays, MRI cervical spine. She was treated with analgesics and therapy modalities.

Ms. Lovas experienced acute exacerbations. During month of March 1990, she was hospitalized for four days with severe pain.

Ms. Lovas' symptoms persisted. During month of May 1990, her additional diagnostic studies included EMG/NCV both upper extremities, MRI lumbar spine, C.T. Scan head.

Ms. Lovas continued with neurological follow-up. She underwent C.T. Scan head in May 1991. She underwent repeat C.T. Scan head in April 1992. Ms. Lovas continue[d] with treatment which included analgesics, anti-inflammatory medications and Chiropractic treatment.

During course of her employment with Cafaro Management Company, Inc., Ms. Lovas slipped and fell on some papers that were scattered on the floor. She was transferred by ambulance to St. Elizabeth Health Center. Diagnostic studies included X-rays cervical spine, lumbar spine, left knee.

Ms. Lovas was treated with analgesics and therapy modalities. For increasing symptoms knee, she underwent MRI left knee on October 17, 2008.

Ms. Lovas was referred to Dr. Fumich. On December 18, 2009, she underwent surgery for diagnostic and operative arthroscopy of the left knee with patellar chondroplasty, synovectomy, patellofemoral joint.

Ms. Lovas was further treated with Dr. Morley with medications and therapy modalities.

**Present Complaints**

Ms. Lovas experienced recurring headaches which were frequent, throbbing and encircling entire head. She complained of dizzy spells with headaches.

She reported that over a period of time, neck pain was progressively worse. Pain radiated to both arms. She complained of numbness and tingling sensation in both hands and fingers. She complained of weakness in both arms. She had episodes of dropping things while lifting.

Ms. Lovas reported constant pain right shoulder. Pain continued to extend to neck and downward to the right arm. She complained of recurring pain elbow. She continued to have difficulty with overhead work. Activities such as pushing, pulling or lifting caused an increase in pain.

She described constant pain and stiffness mid-low back. Pain was sharp, burning and extending to both legs. She had episodes of numbness lateral aspect of both thighs and legs. She complained of recurring pain hip and knee joints. She experienced frequent swelling knee joint. She complained of weakness both legs and at times, legs gave out while walking. She had difficulty walking or standing for an extended period of time. Climbing or descending stairs caused increase in pain.

**Physical Examination**

Examination revealed a 56-year-old female in pain and discomfort and walking with an antalgic gait. Height 5'4", Weight 137 lbs. BP 121/81 mmHg., Pulse 91/m.r.

Examination of the cervical spine revealed tenderness in the midline over the spinous processes and in the adjacent paraspinous muscles. There was also muscular tightness in the paracervical region, most evident with the neck hyperflexion. Mobility was restricted with flexion 45 degrees and extension 55 degrees. Right and left lateral flexion 25 degrees and right and left rotation 55 degrees. Deep tendon reflexes were 1 + both upper extremities.

Examination of the right shoulder joint revealed tenderness over anterior aspect, extending from bicipital tendon to acromioclavicular joint. Restriction in range of motion shoulder joint with flexion 150 degrees and extension 30 degrees. Abduction 130 degrees and adduction 30 degrees.

Internal rotation 60 degrees and external rotation 60 degrees. Examination of the left elbow joint revealed mild tenderness. Mobility was normal in range with pain at extreme range of motion.

Examination of thoracic spine revealed tenderness extending from T4-T8 paraspinal musculature regions. Protraction, retraction and elevation of scapuli were painful. Mobility thoracic spine was restricted with flexion 30 degrees, right and left rotation 20 degrees.

Examination of lumbar spine revealed lumbosacral spine tenderness over lumbar spinous processes and over both paraspinous muscular masses. Spasm of paralumbar muscles was noted. Range of motion was restricted with flexion 55 degrees and extension 25 degrees. Right and left lateral flexion 25 degrees. Straight leg raising test produced low back pain and radiating pain to legs at 55 degrees. Achilles and Patellar reflexes were 1 + bilaterally.

Examination of the left knee joint revealed scars secondary to previous arthroscopic surgery. Tenderness was noted circumferentially over the left knee joint. Tenderness was more severe over the lateral and medial joint lines. There was limited flexion and extension with flexion 70 degrees and extension lag 20 degrees. Both were associated with pain. Medial and lateral collateral instability was evident with positive Anterior Drawer Sign. Examination of left hip joint revealed tenderness lateral aspect.

* * *

## Opinion

After reviewing history of accident, clinical course, diagnostic studies, subjective, objective findings, in my opinion, **Ms. Lovas with regards to claim number 90-1125, 08-852146, cervical, dorsal and lumbar myositis, tendonitis right shoulder and arm, bulging disc at L5-S1, lumbar and cervical radiculopathy, post headache syndrome, rotator cuff strain, right, trapezial myositis, contusion of buttock, contusion of back, cervical sprain, thoracic sprain, lumbar sprain, left knee sprain, contusion left elbow, contusion left hip, substantial aggravation of pre-existing chondromalacia patella left knee is**

> **permanently and totally disabled from engaging into any gainful employment.**

(Emphasis sic.)

{¶ 25} 8. On July 14, 2011, at claimant's own request, she was examined by neuropsychologist James M. Lyall, Ph.D.  In his five-page narrative report, Dr. Lyall states:

> **SUMMARY AND CONCLUSIONS**
>
> It appears that we have a fifty-seven year old woman who was working successfully, up until a 1990 industrial injury, in which she feel [sic] sixteen feet injuring her back and other orthopedic areas. She was off work for over twelve years, by her own report, and then was able to return to work performing secretarial duties. It appears that she continued these duties, up until about 2008 when she had a second industrial injury. The claimant reports that the second industrial injury has improved significantly but she continues to have serious and enduring back and rib cage difficulties as a result of her initial 1999 [sic] industrial injury. She continues to receive medical care for her original injury and is taking a Pain Patch and Nucynta for pain relief. She still describes her pain as quite high as a result of her original 1990 industrial injury. It should also be noted that the claimant has two allowed psychological conditions associated with her 1990 injury. These include Depressive Disorder and Dysthymic Disorder.
>
> The current evaluation points to significant continuing symptoms of depression. These symptoms are seen both on the Mental Status Examination and on the MMPI-2 profile. In fact, the claimant's level of depression on the MMPI-2 profile appears to be within the severe range. The claimant shows significant signs of depression throughout the interview and even in the testing room when she felt she was not being observed she was discovered to be crying. The claimant has continued in psychological treatment with Dr. Duval for going on three years. She also uses the antidepressant Cymbalta as well as Ambien and Elavil in treating her depressive symptoms.
>
> * * *

Utilizing the AMA Guidelines for Impairment Due to Mental and Behavioral Disorders, Fifth Edition, we see moderate to severe impairment due exclusively to a combination of the claimant's two psychological conditions to include Depressive Disorder and Dysthymic Disorder. This would fall at Class 4 and yield forty-five percent (45%) impairment due exclusively to a combination of the two psychological conditions to the whole body.

This claimant's functional abilities are quit[e] complicated by her allowed psychological conditions and make it difficult for her to engage in regular normal activities, let alone, the complicated actions required in a work atmosphere. She shows signs of significant problems in activities of daily living, socialization, focus and concentration and adaptation to stress. Taking these factors into account and the high degree of the claimant's impairment due to her psychological conditions, it is this examiner's opinion to a reasonable degree of psychological certainty that the claimant will be unable to engage in regular remunerative competitive employment due to her psychological difficulties to the whole body. As such, it is this examiner's opinion that the claimant will be permanently and totally disabled due to a combination of her two psychological conditions as described above.

{¶ 26} 9. On July 25, 2011, claimant filed an application for PTD compensation. In support, claimant submitted the May 25, 2011 report of Dr. Patel and the July 14, 2011 report of Dr. Lyall.

{¶ 27} 10. On August 22, 2011, at relator's request, claimant was examined by Richard N. Kepple, M.D., for all the allowed conditions in the 2008 claim.  In his six-page narrative report, Dr. Kepple responded to several questions:

Based on the current objective findings and the allowed physical conditions, is Ms. Lovas capable of performing any form of remunerative employment? Please indicate the type of work Ms. Lovas is capable of performing. Please present rationale.

Based on my examination and review of the provided medical records, Ms. Lovas is capable of sustained remunerative employment in a primarily sedentary capacity that is upper extremity oriented and does not involve operation of levers or pedals with her left lower extremity.

These restrictions are based solely on the allowed conditions of claim 08-852146.

**In your medical opinion, based on a reasonable degree of medical certainty and the allowed physical conditions, is Ms. Lovas permanently and totally disabled?**

Ms. Lovas is not permanently and totally disabled due to any of the allowed conditions of claim number 08-852146. The contusion injuries have all resolved, as have the sprain injuries of the neck and thoracic spine. Left knee/leg sprain has also resolved, but the chondromalacia patella allowance remains mildly symptomatic. As it has been 3 years since the injury and almost 2 years since the left knee surgery, the aggravation allowance relative to the left knee must be considered to have reached maximum medical improvement.

(Emphasis sic.)

{¶ 28} 11. On October 26, 2011, at the commission's request, claimant was examined by psychologist Steven B. Van Auken, Ph.D., who issued a ten-page narrative report. Dr. Van Auken examined only for the allowed psychological conditions in the 1990 claim. That is, Dr. Van Auken examined claimant for the claim allowances described as "depressive disorder" and "dysthymic disorder."

{¶ 29} 12. On November 1, 2011, Dr. Van Auken completed a form captioned "Occupational Activity Assessment[,] Mental & Behavioral Examination." On the form, Dr. Van Auken indicated by his mark, "[t]his injured worker is incapable of work." In the space provided, Dr. Van Auken wrote:

In and of themselves, Ms. Lovas's [sic] depressive symptoms - - including diminishments in concentration, energy level, social tolerance, and stress tolerance - - would prevent her from succeeding in sustained remunerative employment.

{¶ 30} 13. On December 15, 2011, at the commission's request, claimant was examined by Paul B. Bartos, M.D. Dr. Bartos examined for all the allowed physical conditions of the two industrial claims. In his seven-page narrative report dated January 8, 2012, Dr. Bartos concluded:

Based upon the history and physical examination, review of the medical documentation provided, review of the

> mechanism of injury, treatment received and response to treatment, as well as the effect of the injury on her activities of daily living, it is my professional medical opinion within reasonable medical certainty that the claimant is capable of light duty work. She is certainly capable of lifting 20 pounds on an occasional basis and 10 pounds frequently. She may need to change positions as needed from sitting to standing depending on her symptoms.

{¶ 31} 14. On December 15, 2011, Dr. Bartos completed a Physical Strength Rating form. On the form, Dr. Bartos indicated by his mark that claimant is capable of "light work."

{¶ 32} 15. Following an April 11, 2012 hearing, a staff hearing officer ("SHO") issued an order that awards PTD compensation starting July 11, 2011. The SHO also allocated the award between the two industrial claims. Twenty-five percent of the award was allocated to the 2008 claim for which relator is liable. Seventy-five percent of the award was allocated to the 1990 claim. The SHO's order explains:

> [I]t is the order of the Staff Hearing Officer that the Application filed 07/25/2011 for Permanent Total Disability Compensation be granted to the following extent;
>
> Permanent total disability benefits are hereby awarded from 07/11/2011 (less any compensation that previously may have been awarded over the same period), and to continue without suspension unless future facts or circumstances should warrant the stopping of the award and that payment be made pursuant to R.C. 4123.58(A).
>
> This order is based upon the narrative report from Dr. Steven [Van Auken], Ph.D., Dr. T.M. Patel, M.D. and Dr. James Lyall, Ph.D. who all indicate that the Injured Worker is permanently and totally disabled and unable to engage in any sustained remunerative employment.
>
> The Staff Hearing Officer finds that it is not necessary to consider the Injured Worker's disability factors since the Injured Worker has reached maximum medical improvement and is medically unable to perform any sustained remunerative employment.

The Staff Hearing Officer relies upon the case of State ex rel. Galion Mfg. Div. Dresler Indus. Inc. v. Haygood (1991), 60 Ohio St.3d 38 wherein the court states;

A claimant who has multiple allowed conditions is not required to show that each condition standing alone, is work prohibited...while permanent total disability benefits may never be denied solely on the basis of medical evidence without consideration of Stephenson factors contained in the record, there are some situations wherein an award of such benefits may properly be based on medical factors alone. It would serve no practical purpose for the Commission to consider non-medical factors in extreme situations where medical factors alone preclude sustained remunerative employment, since non-medical factors will not render the claimant any more or less...able to work.

Permanent total disability benefits are to begin 07/11/2011, the date of Dr. T.M. Patel's report which is the first reliable medical report indicating that the Injured Worker is permanently and totally disabled.

It is further ordered that the above award be allocated as follows:

75% of the award is to be paid under claim number 90-1125[.]

25% of the award is to be paid under claim number 08-852146.

The Staff Hearing Officer bases his allocation of the award on the medical reports of Dr. Steven [Van Auken], Dr. T.M. Patel and Dr. James Lyall. Dr. Patel examined the Injured Worker and makes no determination as to the "breakdown" regarding percentage of impairment in each file. Dr. [Van Auken] and Dr. Lyall all base their opinion of permanent total disability solely based upon the allowed psychological condition which is only recognized in claim number 90-1125.

The Staff Hearing Officer finds that some allocation shall be placed in claim number 08-852146 as claim number 08-[852146] is the injury that removed the Injured Worker from the work force noting that the Injured Worker had returned to work after his [sic] injuries in claim number 90-1125 for a substantial period of time.

{¶ 33} 16. On April 30, 2012, relator moved for reconsideration. On June 20, 2012, the three-member commission denied reconsideration.

{¶ 34} 17. On July 31, 2012, relator, Cafaro Management Company, filed this mandamus action.

Conclusions of Law:

{¶ 35} Preliminarily, some observations are in order. The commission, through its SHO's order of April 11, 2012, awarded PTD compensation based upon the two industrial claims. Further, the award was based upon the medical reports of Drs. Van Auken, Lyall, and Patel without reference to the vocational factors. That is, the commission determined that the allowed conditions of the two industrial claims prohibit claimant from performing any sustained remunerative employment, a finding that requires an award of PTD compensation without reference to the non-medical or vocational factors. *See* Ohio Adm.Code 4121-3-34(D)(2)(a).

{¶ 36} Only the 1990 claim has allowed psychological conditions. That claim is allowed for "depressive disorder" and "dysthymic disorder."

{¶ 37} At claimant's request, Dr. Lyall, a neuropsychologist, examined only for the allowed psychological conditions in the 1990 claim. Dr. Lyall opined that the allowed psychological conditions render claimant "permanently and totally disabled." Thus, Dr. Lyall's report alone supports an award of PTD compensation based solely upon the 1990 claim.

{¶ 38} At the commission's request, Dr. Van Auken, a psychologist, examined claimant only for the allowed psychological conditions of the 1990 claim. Dr. Van Auken opined that the allowed psychological conditions "would prevent her from succeeding in sustained remunerative employment." Thus, Dr. Van Auken's report alone supports an award of PTD compensation based solely upon the 1990 claim.

{¶ 39} At claimant's request, Dr. Patel examined for all the allowed physical conditions of the two industrial claims. Dr. Patel did not examine for the allowed psychological conditions in the 1990 claim. Dr. Patel opined that the allowed physical conditions of both industrial claims render claimant "permanently and totally disabled from engaging into any gainful employment." Thus, Dr. Patel's report, on its face, is the only relied upon report that connects both industrial claims to the PTD award.

{¶ 40} Based upon the above observations, it is clear that elimination of Dr. Patel's report from evidentiary consideration would leave the PTD award unconnected causally to the 2008 claim.  If relator can eliminate Dr. Patel's report from evidentiary consideration, there would be no evidence upon which the commission relied to support any allocation of the PTD award to the 2008 industrial claim.  Consequently, relator endeavors here to show that Dr. Patel's report is equivocal and, on that basis, presents no evidence upon which the commission can rely.

{¶ 41} Given the above analysis, the first issue is whether the report of Dr. Patel provides some evidence upon which the commission can rely to support a finding that both industrial claims contributed causally to the inability to perform sustained remunerative employment.  Furthermore, if Dr. Patel's report is some evidence upon which the commission can rely to support a finding that both industrial claims contributed to claimant's disability, there is a further issue of whether the commission has any basis to allocate 25 percent of the award to the 2008 industrial claim.

{¶ 42} Parenthetically, while relator suggests here that it is challenging the PTD award itself, clearly it is not.  Even with the elimination of Dr. Patel's report, the PTD award is fully supported by the psychological conditions of the 1990 claim and the reports of Drs. Lyall and Van Auken.  Significantly, relator does not challenge the reports of Drs. Lyall and Van Auken as providing the some evidence supporting the PTD award.  Relator only challenges the reliance upon Dr. Patel's report in order to eliminate any allocation of the award to the 2008 claim.

### Dr. Patel's Report

{¶ 43} Equivocal medical opinions are not evidence.  *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649, 657 (1994).  Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions or fails to clarify an ambiguous statement.  *Id.*

{¶ 44} A medical report can be so internally inconsistent that it cannot be some evidence upon which the commission can rely.  *State ex rel. Lopez v. Indus. Comm.*, 69 Ohio St.3d 445 (1994); *State ex rel. Taylor v. Indus. Comm.*, 71 Ohio St.3d 582 (1995).  However, a court will not second-guess a doctor's medical expertise to support a claim of internal inconsistency.  *State ex rel. Young v. Indus. Comm.*, 79 Ohio St.3d 484 (1997).

{¶ 45} In Dr. Patel's report, it can be observed that he listed all the allowed physical conditions of the two industrial claims and concluded that those allowed conditions cause an inability to engage in gainful employment.   Relator calls this "Dr. Patel's shotgun approach."  (Relator's brief, at 15.)

> Finding it "[m]ore troubling," relator asserts:
>
> [T]here appears to be zero support listed for a number of the allegedly disabling conditions including, but not limited to, the following: post-traumatic headache syndrome; rotator cuff strain, right; contusion of buttock; and contusion of back. For example, there is absolutely no indication that Dr. Patel observed any bruises (i.e. contusions) whenever he physically examined Lovas.

(Relator's reply brief, at 6.)

{¶ 46} Relator asserts that Dr. Patel should have differentiated between the strains and contusions that have allegedly resolved and those conditions that relator asserts here were "much more significant."  (Relator's reply brief, at 7.)

{¶ 47} Relator also faults the report on grounds that Dr. Patel allegedly failed to connect claimant's subjective complaints to an allowed condition.  Relator refers to this as a "lumping technique."  (Relator's reply brief, at 6.)   That is, relator asserts that "the allowed conditions should not have been lumped together." (Relator's reply brief, at 6.)

{¶ 48} Based upon relator's analysis of Dr. Patel's report, relator concludes that the report is equivocal and thus cannot constitute some evidence upon which the commission can rely to support the PTD award.  The magistrate disagrees.

{¶ 49} Dr. Patel indicates in his report his awareness of the allowed physical conditions of both industrial claims.  His five-page report is divided into five parts.  The first part is captioned "History and Clinical Course."   The second part is captioned "Present Complaints."  The third part is captioned "Physical Examination."  The fourth part is captioned "Review of Medical Records."  The fifth part is captioned "Opinion."

{¶ 50} Under the caption "Physical Examination," the report indicates that Dr. Patel examined the cervical spine, the right shoulder, the left elbow joint, the thoracic spine, the lumbar spine, the left knee joint and the left hip.  Dr. Patel states his clinical findings as to each body area he examined.

{¶ 51} Presumably, given the multitude of alleged physical conditions of the two industrial claims, it can be said that some of the allowed conditions may contribute more significantly to disability than others.  Dr. Patel did not endeavor to address this.

{¶ 52} Perhaps a reference to the commission's medical examination manual, effective July 2012, may be helpful to an understanding of the issue relator attempts to raise even though no party to this action makes reference to the manual.

> The introduction to the manual states:

> This Manual presents Commission policies for independent medical examinations and medical file reviews. The purpose of the independent medical examination (IME) is to determine the degree of impairment resulting from an allowed work injury. Most examinations are to assist the Commission in the consideration of Permanent Total Disability (PTD). The first section of the manual explains administrative and examination policies common to all Commission independent examinations and file reviews. The remaining six sections of the manual describe specific examination requirements for evaluating various body parts, regions, or organ systems affected by an industrial injury or disease, and some special considerations related to maximum medical improvement.

(*Medical Examination Manual* 1.

{¶ 53} Under the heading "Examinations By Body Systems[,] Musculoskeletal, Cardiovascular, Respiratory, Central and Peripheral Nervous System," the manual provides the commission's requirements for an "opinion."  Thereunder, the second enumerated paragraph provides:

> 2. Based on AMA Guides, Fifth Edition, and with reference to the Industrial Commission Medical Examination Manual, provide the estimated percentage of whole person impairment from each of the allowed condition(s). Please list each condition and whole person impairment separately, and then provide a combined whole person impairment. If there is no impairment for an allowed condition, indicate zero percent.

> Cite the AMA Guides source for your impairment opinion.

(*Medical Examination Manual* 31.)

{¶ 54} Had Dr. Patel followed the above noted provisions of the commission's medical examination manual, perhaps much of relator's argument would have been undermined.  However, Dr. Patel was not an independent medical examiner covered by the manual.  Dr. Patel was not required to use the AMA Guides, Fifth Addition, and there was no indication that he did.  Relator cites to no authority suggesting that a claimant-requested medical report must apply the AMA Guides in order that the opinion contained therein constitutes some evidence upon which the commission can rely.

{¶ 55} Again, the magistrate recognizes that relator has not argued that Dr. Patel was required to follow the commission's medical examination manual.  Nevertheless, the magistrate finds the above discussion helpful to a resolution of relator's challenge to the report of Dr. Patel.

{¶ 56} In short, the magistrate finds that Dr. Patel's report is some evidence connecting the 2008 claim to permanent and total disability.

### The Allocation

{¶ 57} Given that Dr. Patel's report provided the commission with some evidence connecting the 2008 industrial claim to permanent and total disability, the further issue is whether the commission has any basis to allocate 25 percent of the award to the 2008 claim.

> Again, the commission explains its allocation decision as follows:
>
> The Staff Hearing Officer bases his allocation of the award on the medical reports of Dr. Steven [Van Auken], Dr. T.M. Patel and Dr. James Lyall. Dr. Patel examined the injured Worker and makes no determination as to the "breakdown" regarding percentage of impairment in each file. Dr. [Van Auken] and Dr. Lyall all base their opinion of permanent total disability solely based upon the allowed psychological condition which is only recognized in claim number 90-1125.
>
> The Staff Hearing Officer finds that some allocation shall be placed in claim number 08-852146 as claim number 08-[852146] is the injury that removed the Injured Worker from the work force noting that the Injured Worker had returned to work after his [sic] injuries in claim number 90-1125 for a substantial period of time.

{¶ 58} In *State ex rel. Erieview Metal Treating Co. v. Indus. Comm.,* 10th Dist. No. 04AP-447, 2005-Ohio-1154, *affirmed* 109 Ohio St.3d 147, 2006-Ohio-2036, this court, speaking through its magistrate, states:

> In *State ex rel. yellow Freight Sys., Inc. v. Indus. Comm.* (1994), 71 Ohio St.3d 139, 642 N.E.2d 378, the Supreme Court of Ohio applied the principles set forth in *State ex rel. Noll v. Indus. Comm.* (1991), 57 Ohio St.3d 203, 567 N.E.2d 245, to the commission's practice of allocating PTD awards involving multiple industrial claims. The *Yellow Freight* court explained:
>
> *All* matters affecting the rights and obligations of the claimant or employer merit an explanation sufficient to inform the parties and potentially a reviewing court of the basis for the commission's decision.
>
> Id. at 142, 642 N.E.2d 378. (Emphasis sic.)
>
> Clearly, the basis for the allocation must be consistent with the medical evidence relied upon in support of the award. *State ex rel. Hay v. Indus. Comm.* (1990), 52 Ohio St.3d 99, 555 N.E.2d 965.
>
> In *Hay,* the commission divided a PTD award between two claims, assigning 35 percent to the 1971 claim, and 65 percent to the 1975 claim. The commission's PTD award was based upon the reports of Dr. Gary I. Katz and Dr. Stephen P. Combs. However, Drs. Katz and Combs attributed the claims disability exclusively to the 1975 claim. In mandamus, the commission argued that its 35 percent allocation to the 1971 claim was supported by a prior 35 percent permanent partial disability award in the 1971 claim. Rejecting the commission's argument, the *Hay* court explained that PTD is not measured numerically, but, instead, on the claimant's ability to engage in sustained remunerative employment. The *Hay* court ordered that the commission allocate the PTD award wholly to the 1975 claim, because the relied-upon medical evidence compelled that result.
>
> Interestingly, in *Hay,* the court noted that the 1971 claim had generated $87 in paid medical expenses, no TTD compensation, and the 35 percent permanent partial disability award. The *Hay* court further noted that the 1975 claim had resulted in $54,000 in paid medical bills, $28,000

in TTD compensation, and a 22 percent permanent partial disability award. Thus, the decision at least suggests that a comparison of the compensation and benefits paid in the claims may be relevant evidence to consider in an allocation.

*Id.* at ¶ 29-32.

{¶ 59} Here, the commission's allocation of 25 percent of the award to the 2008 claim is not necessarily inconsistent with the medical evidence relied upon in support of the award. This is so because the report of Dr. Patel does connect PTD to the 2008 claim as well as the 1990 claim.

{¶ 60} Moreover, it was not necessarily improper for the commission to point out in its order that it was the injury in the 2008 claim that removed claimant from the workforce, given that claimant's last working day was the August 25, 2008 injury. Thus, some percentage allocation to the 2008 claim would be proper, but at what percentage?

{¶ 61} It is not obvious from the record before this court how the commission determined that 25 percent of the award should be allocated to the 2008 claim nor does the commission's order offer any explanation. Moreover, the commission here offers no explanation in this mandamus action.

{¶ 62} Given the commission's duty to explain the basis for its allocation, the magistrate concludes that the commission abused its discretion by allocating 25 percent of the award to the 2008 claim without an explanation that this court can review in mandamus.

{¶ 63} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate that portion of its SHO's order of April 11, 2012 that allocates the award, and to enter a new order in a manner consistent with this magistrate's decision that properly allocates the award between the two industrial claims.

/s/ *Kenneth W. Macke*
KENNETH W. MACKE
MAGISTRATE

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).